Barry I. Levy, Esq.
Michael Vanunu, Esq.
Garin Scollan, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

                                Plaintiffs,

              -against-

JEAN-PIERRE BARAKAT, M.D., DR. JEAN PIERRE
BARAKAT, M.D. (A Sole Proprietorship), PATRIOT
MEDICAL CARE, P.C., JPB TODT HILL MEDICAL
CARE, P.C., and JOHN DOE DEFENDANTS "1" through
"10",

                                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No.:_____ (    )

**Plaintiff Demands a Trial by Jury**

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against Defendants Jean-Pierre Barakat, M.D., Dr. Jean Pierre Barakat, M.D. (A Sole Proprietorship), Patriot Medical Care, P.C., JPB Todt Hill Medical Care, P.C., and John Doe Defendants "1" through "10" (collectively, referred to hereinafter as the "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $644,000.00 that Defendants have wrongfully obtained from GEICO by submitting, and causing to be submitted hundreds of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable healthcare services styled as extracorporeal shockwave therapy (hereinafter "ESWT"), initial consultations and follow-up examinations (collectively the "Fraudulent Services").  The Fraudulent Services allegedly were provided to New York automobile accident victims who were insured by GEICO ("Insureds").  In addition to recovering the money wrongfully obtained, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than  $820,000.00 in pending no-fault insurance claims for the Fraudulent Services because:

(i)      the Fraudulent Services were allegedly provided by and billed through the Barakat Practices (as defined below), which are medical "practices" not under the control and direction of Jean-Pierre Barakat, M.D., but rather, were at all relevant times operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers;

(ii)      the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics (as defined below);

(iii)      the Fraudulent Services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;

(iv)      the claim submissions seeking payment for the Fraudulent Services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided to Insureds; and

(v)      All of the ESWT services, to the extent provided at all, were not provided by Jean-Pierre Barakat, M.D. or any other licensed physician, but by persons who were unlicensed, and were neither directly supervised by Jean-

Pierre Barakat, M.D. nor employed by him or the Barakat Practices (as defined below).

2. Defendant Jean-Pierre Barakat, M.D. ("Barakat") is a New York physician who purports to own and operate the following medical "practices": (i) Dr. Jean Pierre Barakat, M.D. under his tax identification number 03-940XXXX (the "Barakat Sole Proprietorship"); (ii) Patriot Medical Care, P.C. ("Patriot Medical"); and (iii) JPB Todt Hill Medical Care, P.C. ("JPB Medical", and collectively with the Barakat Sole Proprietorship and Patriot Medical, the "Barakat Practices"). Barakat purported to use the Barakat Practices to provide the Fraudulent Services, including medically unnecessary ESWT. In fact, Barakat and the Barakat Practices (collectively, the "Barakat Defendants"), in combination with John Doe Defendants "1" through "10" (the "John Doe Defendants"), engaged in a massive fraudulent insurance scheme against GEICO and the New York automobile insurance industry in which they billed GEICO alone more than $1.5 million for the alleged performance of the Fraudulent Services at approximately fifteen (15) separate locations from February 2021 to the present. The claim submissions made to GEICO seeking payment of no-fault benefits for the Fraudulent Services, all represented that Barakat was the legitimate owner of the Barakat Practices and that he allegedly performed all the Fraudulent Services. In truth, Barakat performed none of the ESWT services and did not legitimately own, operate, manage or control the Barakat Practices.

3. In or about 2021, the Defendants engineered this fraudulent scheme on the heels of material changes adopted by the New York Department of Financial Services regarding the application of the New York Workers Compensation Fee Schedule ("Fee Schedule") to New York's no-fault reimbursement. Those changes eliminated billing abuses and fraudulent treatment practices that had plagued the automobile insurance industry for more than a decade by, among other things, (i) making many services that had been historically abused either ineligible for

reimbursement or subject to reduced reimbursement, (ii) limiting chiropractor billing to CPT codes in the chiropractic section of the fee schedule, and (iii) controlling reimbursement among providers who rendered concurrent care to patients by establishing daily reimbursement limits for all related disciplines.

4.     In contrast to these changes, the Fee Schedule changes did not materially alter reimbursement for performance of the ESWT and, importantly, for the first time established a definitive rate of reimbursement of approximately $700.00 for performance of ESWT, which has historically been a Category III Code (0101T) with a "BR" designation, meaning that definitive reimbursement had not previously been established.  Prior to October 2020, ESWT was virtually never performed on automobile accident patients or billed to automobile insurers, in part because of the lack of established reimbursement and because – if properly performed – service required considerable investment, including direct involvement by a physician in the performance of the service and the use of physical equipment that is very costly and is not typically portable.

5.     Defendants seized on these changes in the Fee Schedule (or lack thereof). The Barakat Defendants in association with the John Doe Defendants, concocted a fraudulent treatment and billing scheme pursuant to which the Fraudulent Services were allegedly rendered on an itinerant basis – including, all of the ESWT services performed by unlicensed "technicians" – at a large number of multidisciplinary clinics located throughout the New York area that purported to provide treatment to patients with no-fault insurance, but which in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud (the "Clinics"). The Defendants had the Barakat Practices generate falsified reports to create a false justification for the performance of the medically unnecessary and illusory Fraudulent Services, and would then submit the reports, documents and bills for thousands of dollars per patient to New York

automobile insurance companies, including GEICO, seeking payment for the performance of the Fraudulent Services.

6.      The success of the fraudulent scheme required coordination between the Barakat Defendants and the John Doe Defendants.  In furtherance of the fraudulent scheme, they took the following actions:

(i)      Barakat allowed the John Doe Defendants to use his name, medical license and the Barakat Practices to bill GEICO and other New York automobile insurance companies for the alleged performance of the Fraudulent Services.

(ii)     Barakat Defendants associated with "processors" who are among the John Doe Defendants.  Processors are individuals and/or entities within the no-fault industry who earn money by: (i) establishing relationships with laypersons that are associated with the Clinics, (ii) collecting the no-fault claims (i.e., the paperwork) from the Clinics for services that are allegedly provided to individuals covered by no-fault insurance, and (iii) referring the no-fault billing and collection work to New York collection lawyers.

(iii)    Barakat Defendants, through their association with the John Doe Defendants, established illegal referral and kickback arrangements with the owners and/or managers of the Clinics to allow the Defendants to access a steady stream of patients to be able to fraudulently bill GEICO and other automobile insurers, and exploit New York's no-fault insurance system for financial gain without regard to genuine patient care.

7.      Once the pieces were in place, the John Doe Defendants (i) used Barakat's medical license and the names and tax identification numbers of the Barakat Practices to generate large quantities of false and fraudulent documents, including NF-3 forms (i.e., bills), assignment of benefit forms, and medical records, and (ii) used the Barakat Practices as fictional healthcare "practices" to serve as the billing vehicle through which hundreds of thousands of dollars of billing for the Fraudulent Services could be submitted to GEICO and other New York automobile insurers.

8.      Because each of the Barakat Practices was nothing more than a shell to hide the John Doe Defendants' participation in the scheme, it was equally critical to the success of the

fraudulent scheme for the Barakat Defendants and John Doe Defendants to partner with New York collection attorneys who were willing to:

> (i)     purport to represent the physician and the billing entities;
>
> (ii)    provide for or arrange for "funding" (i.e., financing against receivables) of the fraudulent billing to be submitted to GEICO and other New York insurers in connection with the unlawful scheme through companies in which the attorney/law firms either owned or with whom they had relationships;
>
> (iii)   pursue payment and collection against GEICO and other New York automobile insurers by knowingly (a) submitting fraudulent bills to the insurers for the Fraudulent Services, and (b) pursuing collection lawsuits and/or arbitrations seeking payment on the claims that were denied or claimed to have been improperly paid; and
>
> (iv)   accept the insurance payments received from automobile insurers through their attorney IOLA/Trust accounts, and then distribute the payments to third parties, including the John Doe Defendants.

9.     At the time, the John Doe Defendants had an ongoing relationship with several New York collection attorneys, and had in their possession copies of documents used by the collection lawyers that would be needed to facilitate the funding (i.e., the securing of advances against the claims) and the billing and collections on the fraudulent claims, including documents such as retainer letters, payment directives, and funding agreements.

10.    The John Doe Defendants used the information received from Barakat to manufacture: (i) the claim documents necessary to support the fraudulent claim submissions, including assignment of benefits ("AOBs") forms and other medical records, (ii) the engagement letter and associated documents needed by the collection lawyers to bill and collect on the Fraudulent Services, and (iii) the funding agreements to present to companies who were willing to advance money against the receivables (the "Funders"). Once the documents were in place with the Funders, the Funders began transferring money to the John Doe Defendants as "advances" against the claims for the Fraudulent Services. John Doe Defendants were not signatories to the

funding agreements, received the money without risk, and used the payments received from the Funders for their own benefit, as well as to pay individuals and entities to perpetuate the Defendants' fraudulent scheme.

11.     The John Doe Defendants provided the package of fabricated documents associated with treatment, billing, collection and funding efforts to the collection lawyers. Once the documents were processed by the collection lawyers and/or billing companies with whom they associated into bills (i.e., "NF-3" forms) using the name of the Barakat Practices, the collection lawyers organized the claim submissions and mailed them to GEICO and other insurance companies seeking payment.  The collection lawyers:

    (i)     purported to represent Barakat and the Barakat Practices in hundreds of writings sent to GEICO;

    (ii)    arranged and/or interfaced to effectuate the "funding" of the bills that were submitted to GEICO and other New York insurers in the name of the Barakat Practices;

    (iii)   systemically pursued payment and collection against GEICO and other New York automobile insurers on behalf of the Barakat Practices; and

    (iv)    collected insurance payments from GEICO and other New York automobile insurers and deposited those payments into their IOLA/Trust Accounts.

12.     As discussed herein, the Defendants at all relevant times have known that: (i) Barakat was not in control of the Barakat Practices, which were operated, managed and controlled by the John Doe Defendants for purposes of effectuating a large scale insurance fraud scheme, (ii) the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons and as a result of illegal financial arrangements between the Defendants and the Clinics, (iii) the Fraudulent Services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds, and (iv) all of the ESWT services,

to the extent provided at all, were never performed by Barakat or by any other licensed practitioner but by persons who were never directly supervised by Barakat or employed by the Barakat Practices.  The charts annexed hereto as Exhibit "1" – "3" set forth a representative sample of the fraudulent claims that the Defendants submitted, or caused to be submitted, to GEICO.

13.     Defendants do not now have – and never had – any right to be compensated for or to realize any economic benefit from the Fraudulent Services that they billed to GEICO.

14.     Defendants' fraudulent scheme began in 2021 and has continued uninterrupted through the present day as Defendants continue to seek collection on pending charges for the Fraudulent Services.  As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $644,000.00.

## THE PARTIES

### I.     Plaintiffs

15.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.    Defendants and Other Relevant Individuals

16.     Defendant Barakat resides in and is a citizen of New York.  Barakat is a physician licensed to practice medicine and agreed to allow for the formation of the Barakat Practices and to "front" as the owner of the Barakat Practices while allowing the John Doe Defendants to use his license and the Barakat Practices as a billing "vehicle" as part of the fraudulent scheme committed against GEICO and other New York automobile insurers.

17.     Defendant Barakat Sole Proprietorship is a New York sole proprietorship with its principal place of business as 795 Todt Hill Road, Staten Island, New York.

18.     Defendant Patriot Medical is a New York professional corporation with its principal place of business as 795 Todt Hill Road, Staten Island, New York.

19.     Defendant JPB Medical is a New York professional corporation with its principal place of business as 795 Todt Hill Road, Staten Island, New York.

20.     John Doe Defendants are citizens of New York.  John Doe Defendants are unlicensed, non-professional individuals and entities, presently not identifiable to GEICO, who knowingly participated in the fraudulent scheme with the Barakat Defendants by (i) unlawfully owning, operating, managing and controlling the Barakat Practices, (ii) establishing relationships with the laypersons associated with the Clinics, (iii) collecting the no-fault claims (i.e., the paperwork) from the Clinics for the Fraudulent Services, (iv) arranged for and providing the funding associated with the Fraudulent Services, and (v) referring the no-fault billing and collection work associated with the Fraudulent Services to New York collection lawyers.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

22.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

23.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

24.     GEICO underwrites automobile insurance in New York.

## I.     An Overview of Pertinent Law Governing No-Fault Reimbursement

25.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

26.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including medical services.

27.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

28.     Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").  In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

29.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

30.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York …. (Emphasis added).

31.     In New York, only a licensed physician may: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

32.     Unlicensed non-physicians may not: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

33.     New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for patient referrals.  See, e.g., New York Education Law §§ 6509-a; 6530(18); and 6531.

34.     New York law prohibits unlicensed persons not authorized to practice a profession, like medicine, from practicing the profession and from sharing in the fees for professional services. See, e.g., New York Education Law § 6512, § 6530(11), and (19).

35.     Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in

exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments or allows unlicensed laypersons to share in the fees for the professional services.

36.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

37.     Pursuant to the No-Fault Laws, only health care providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her health care provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

38.     Accordingly, for a health care provider to be eligible to bill for and to collect charges from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the actual provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

39.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

40.     When a healthcare services provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code was performed on the patient; (ii) the service described by the specific CPT code was performed in a competent manner and in accordance with applicable laws and regulations; (iii) the service described by the specific CPT code was reasonable and medically necessary; and (iv) the service and the attendant fee were not excessive.

41.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     Defendants' Fraudulent Scheme

### A.     Barakat and His Recruitment

42.     Barakat is an Internist and became licensed to practice medicine in New York in 2008.

43.     Defendant Barakat is no stranger to no-fault insurance fraud schemes. In fact, Barakat was named as a defendant in no-fault insurance fraud lawsuits alleging, among other things, that Barakat paid illegal kickbacks in exchange for patient referrals and provided healthcare services and issued prescriptions pursuant to a pre-determined treatment protocol. See Gov't Emples. Ins. Co., et al., v. Barakat, M.D., et al., 17-cv-01066 (E.D.N.Y.); Allstate Ins. Co. et al v.

New Century Pharmacy Inc. et al., 19-cv-05702 (E.D.N.Y.); and Gov't Emples. Ins. Co., et al., v. Direct RX Pharmacy Inc. et al., 19-cv-05876 (E.D.N.Y.).

44.     Barakat is also familiar with illegal kickback and patient referral relationships. Prior to the establishment of the Barakat Practices, Barakat formed several other medical professional corporations, including Far Rockaway Medical, P.C. that billed for the performance of healthcare services. Barakat participated in illegal kickback schemes by issuing checks from Far Rockaway Medical, P.C. to sham companies that were exchanged for cash at Cambridge Clarendon by Alla Kuratova ("Kuratova"), including purported "billing" and "consulting" companies. What is more, between May 2017 and September 2020, Kuratova cashed multiple checks written to three of Barakat's professional corporations, Bronx County Medical Care, P.C., Far Rockaway Medical, P.C., and Richmond Medical Care, P.C., for no legitimate purpose.

45.     Kuratova's actions cashing checks issued Far Rockaway Medical, P.C. and cashing checks issued to three previous professional corporations owed by Barakat are part of a large pattern of illegal money laundering to further illegal pay-to-play schemes. For example, between March 2017 and May 2021, Kuratova visited Cambridge Clarendon over 300 separate occasions and received over $35 million in cash for cashing checks on behalf of well over 1,000 different companies, including a large number of no-fault healthcare providers.

46.     In 2021, Barakat was recruited by the John Does Defendants to participate in a complex insurance fraudulent scheme to bill GEICO and other New York automobile insurers hundreds of thousands of dollars for medically unnecessary, experimental, and otherwise reimbursable services.  Based on the arrangement, Barakat would receive a periodic payment in exchange for allowing his name, license and the tax identification number of the Barakat Practices to be used and would contend that he supervised the Fraudulent Services if any insurance company

ever inquired.  At the time, Barakat was a perfect candidate for the fraudulent scheme because he was familiar with no-fault billing and kickback schemes involving his other professional corporations.

47.     By utilizing multiple entities to submit billing for the Fraudulent Services to insurers, the Defendants sought to limit the duration of time through which any one of the Barakat Practices would be used to submit billing for the Fraudulent Services, and thus, to evade detection of their fraudulent scheme and circumvent any investigation into their fraudulent treatment and billing protocols.

### B.     Gaining Access to the Insureds

48.     The Barakat Practices did not have any indicia of legitimacy. None of the Barakat Practices had fixed treatment locations, maintained a stand-alone practice, owned or primarily leased virtually any of the real property from which they purported to provide the Fraudulent Services, did not employ its own support staff, and did not advertise or market its services to the general public.

49.     In fact, the John Doe Defendants controlled the fraudulent scheme by using the name of Barakat and the Barakat Practices on an itinerant basis in connection with the performance of the Fraudulent Services from approximately fifteen (15) separate Clinics where they were given access to steady volumes of patients pursuant to the unlawful referral arrangement, including the following:

- 1065 Old Country Road, Westbury, New York;
- 1647 Macombs Road, Bronx, New York;
- 1655 Richmond Avenue, Staten Island, New York;
- 2426 Eastchester Road, Bronx, New York;
- 1 Perlman Dr, Spring Valley, New York;
- 37-03 92nd Street, Flushing, New York;
- 30 S Ocean Avenue, Freeport, New York;
- 7945 Metropolitan Avenue, Middle Village, New York;

- 900 Route 109, Lindenhurst; New York;
- 1026 Little East Neck Road, West Babylon, New York;
- 325 Merrick Avenue, East Meadow, New York;
- 2260 Hewlett Avenue, Merrick, New York;
- 757 N Main Street, Spring Valley, New York;
- 179 Great Neck Road, West Babylon, New York; and
- 1799 Brentwood Road, Brentwood, New York.

50. To obtain access to the Clinics' patient base (i.e., the Insureds), the Defendants entered into illegal financial and kickback arrangements with the unlicensed persons who controlled the Clinics, who provided access to the patients that were treated, or who purported to be treated, at the Clinics. Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics in actuality, were organized to supply "one-stop" shops for no-fault insurance fraud.

51. Clinics provided facilities for the Defendants, including at many locations,  a "revolving door" of healthcare services professional corporations, chiropractic professional corporations, physical therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

52. In fact, GEICO received billing from an ever-changing number of fraudulent healthcare providers at several of the Clinics, starting and stopping operations without any purchase or sale of a "practice", without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

53. For example, GEICO has received billing for purported healthcare services rendered at the Clinic located at 1655 Richmond Avenue, Staten Island, New York from a revolving door of more than 140 purportedly different healthcare providers.

54.     GEICO also received billing for purported healthcare services rendered at the Clinic located at 7945 Metropolitan Avenue, Middle Village, New York and 2426 Eastchester Road, Bronx, New York from a revolving door of more than 100 purportedly different healthcare providers.

55.     Furthermore, some of the Clinics where the Defendants purportedly provided the Fraudulent Services are listed as "members" of InjuryDocsNow.com ("InjuryDocs"), which, upon information and belief, is a service that receives unlawful referral fees, and, in exchange for these fees, directs no-fault patients to certain locations, including the Clinics, in violation of New York law.

56.     In keeping with the fact that some of the Clinics where the Defendants purportedly provided the Fraudulent Services paid unlawful referral fees to InjuryDocsNow.com, one of the locations listed on InjuryDocs' website, 2426 Eastchester Road, Bronx, New York, has been the subject of a recent federal indictment involving numerous individuals who allegedly paid monies to hospitals, medical providers and others for confidential patient information, and the patients would be contacted and "referred" for medical treatment from a select network of medical clinics (and lawyers) in New York and New Jersey that paid kickbacks to the indicted individuals. See United States of America v. Anthony Rose, et al., 19-cr-00789(PGG)(S.D.N.Y. 2019).

57.     Clinics willingly provided access to the Defendants in exchange for kickbacks and other financial incentives because the Clinics were facilities that sought to profit from the "treatment" of individuals covered by no-fault insurance and therefore catered to high volumes of Insureds at the locations.

58.     In general, the referral sources at the Clinics were paid a sum of money in untraceable cash or payments typically disguised as "rent".  They were in reality, kickbacks for

referrals, and the relationship was a "pay-to-play" arrangement. In connection with this arrangement, when an Insured visited one of the Clinics, he or she was automatically referred by one of the Clinic's "representatives" for the performance of the Fraudulent Services.

59.     Clinic "representatives" typically making the referrals were receptionists or some other non-medical personnel who simply directed or "steered" the Insureds to whichever practice was being given access to the Insureds on a given day pursuant to the unlawful payment and referral arrangement.

### C.     Defendants Place the Fraudulent Scheme In Motion

60.     Once all the necessary "pieces" were in place and Barakat had turned control over to the John Doe Defendants, the John Doe Defendants began to illegally operate and manage the Barakat Practices and implemented the fraudulent billing and treatment scheme, billing GEICO and other New York automobile insurers hundreds of thousands of dollars for the performance of the Fraudulent Services through multiple entities, thereby attempting to evade detection and limit the insurance companies' ability to investigate and address the scheme.

61.     To evade detection, the Defendants scheme also involved using both Patriot Medical and JPB Medical in sequential order. Between February 15, 2021 and March 3, 2022, Barakat and the John Doe Defendants used Patriot Medical to bill GEICO and other New York automobile insurers for ESWT. On or about March 8, 2022, the Defendants abandoned the use of Patriot Medical and used JPB Medical in its place to continue to scheme.

62.     As part of the scheme, the John Doe Defendants also arranged to have the account receivables associated with the billings for the Fraudulent Services "funded" through the Funders with the assistance of the collection lawyers and arranged for documents to be signed directing the payments to be made to them and other third parties rather than Barakat.

63.     As a result of those efforts, the John Doe Defendants received hundreds of thousands of dollars in advances on the claims for the Fraudulent Services from the Funders without any risk because they were never signatories to the agreements.  In addition, the John Doe Defendants had the collection lawyers begin billing GEICO and other New York automobile insurers for the Fraudulent Services.

64.     Through the funding and collection arrangement, the John Doe Defendants controlled the Barakat Practices and were able to realize an immediate financial benefit because they were paid a percentage on the face value of the billings submitted to GEICO for the Fraudulent Services.  The collection lawyers (in turn) would be compensated through the payment of other monies from the insurance companies, including legal fees associated with the collections as well as interest and other charges to be repaid from the collections on the claims for the Fraudulent Services.

65.     In furtherance of this scheme, GEICO received through the United States mail, bills, AOBs, and other records from the Defendants (through the collection lawyers) with respect to more than 1,000 bills involving more than 240 separate patients and seeking payment of more than $1.5 million, doing so through multiple entities to evade detection.

66.     An overwhelming majority of the claims was accompanied by a letter from the collection lawyers, representing that they were legal counsel to Barakat and the Barakat Practices in connection with the collection of charges from GEICO for the performance of the Fraudulent Services.

**D.     The Fraudulent Billing and Treatment Protocols Employed by The Defendants**

67.     The Fraudulent Services billed in the name of the Barakat Practices were not medically necessary and were provided, to the extent they were provided at all, pursuant to pre-

determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.  The Fraudulent Services were further provided pursuant to the dictates of unlicensed laypersons not permitted by law to render or control the provision of healthcare services.

68.     Neither Barakat nor any other licensed professional were ever involved in the performance of virtually all of the Fraudulent Services, including 100% of the ESWT services. To the extent that Barakat's signature appeared on any treatment forms, it was to give the appearance that Barakat supervised the treating healthcare providers' initial consultations, when in reality, he did not supervise these consultations nor any of the Fraudulent Services. In fact, unlicensed laypersons, rather than any healthcare professionals working in the Clinics, developed and controlled the patient base at the Clinics.  Once they were given access, the John Doe Defendants arranged to have Insureds at the Clinics subjected to the Fraudulent Services, which included ESWT services provided by unlicensed technicians that they controlled despite there being no clinical basis for the services and submit to purported therapy services that were experimental and investigational, among other things, all solely to maximize profits without regard to genuine patient care.

69.     In fact, there was no physician involvement with the performance of virtually all of the Fraudulent Services, including all of the ESWT services, and the only point in having the Insureds seen by the unlicensed technicians was to get the patient's signature on a piece of paper so that the John Doe Defendants could get money from the Funders and transmit the claims to the collection lawyers so that they could generate bills and submit them to GEICO seeking payment for the Fraudulent Services to earn their compensation.

70.     Regardless of the nature of the accidents or the actual medical needs of the Insureds, the John Doe Defendants purported to subject virtually every Insured to a pre-determined fraudulent treatment protocol without regard for the Insureds' individual symptoms or presentment.  Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

71.     No legitimate physician or other licensed healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices. This conclusion is reinforced by the fact that there was no physician involvement in  virtually all of the Fraudulent Services, including all of the ESWT services, allegedly performed on Insureds and billed to GEICO.

### 1.     The Fraudulent Charges for Initial Consultations

72.     Upon receiving a referral pursuant to the kickbacks paid to the unlicensed laypersons and/or healthcare professionals associated with the Clinics, including the John Doe Defendants, the Defendants purported to provide the vast majority of the Insureds in the claims identified in Exhibits "1" through "3" with an initial consultation.

73.     In keeping with the fact that the initial consultations were performed pursuant to the kickbacks the Defendants paid at the Clinics, the Barakat Practices virtually always purported to perform the initial consultations at the Clinics where they obtained their initial referrals, rather than at any stand-alone practice.

74.     The initial consultations were performed as a "gateway" in order to provide a false basis to justify the Defendants' exploitation of the Insureds through the Barakat Practices' medically unnecessary, excessive, experimental, and/or illusory services.

75.     In keeping with the fact that the Defendants' initial consultations were not genuine but simply a means to justify their ability to bill for additional services pursuant to a predetermined, fraudulent treatment protocol, the initial consultations resulted in virtually every Insured receiving ESWT on the same date of service, immediately following the initial consultation.

76.     Typically, someone purportedly associated with Barakat and the Barakat Practices purported to perform the initial consultations, which were then billed to GEICO through one of the Barakat Practices.

77.     The Defendants virtually always billed the initial consultations under CPT code 99241, typically resulting in a charge of $152.86 or $152.88.

78.     The charges for the initial consultations were fraudulent in that the consultations were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the kickbacks that the Defendants paid at the Clinics in coordination with the John Doe Defendants, not to treat or otherwise benefit the Insureds.

79.     Furthermore, the Defendants charges for the initial consultations were fraudulent in that they misrepresented the nature and extent of the initial consultations.

80.     For example, the Defendants, in every claim identified in Exhibits "1" through "3" for initial consultations under CPT code 99241, misrepresented and exaggerated the amount of face-to-face time that the examining healthcare professional spent with the Insureds or the Insureds' families.

81.     The use of CPT code 99241 typically requires that a healthcare professional spend 15 minutes of face-to-face time with the Insured or the Insured's family.

82.     Though the Defendants billed virtually all of the initial consultations under CPT code 99241, no licensed healthcare professional associated with the Defendants spent even 10 minutes on an initial consultation, to the extent any were performed at all.

83.     In keeping with the fact that the Defendants' initial consultations did not even last 10 minutes, the Barakat Practices' initial consultations were typically documented via one set of check boxes detailing the patient's complaints at very high levels of generality, such as "cervical," "thoracic" or "lumbar" and one limited set of diagnoses to consider.

84.     What is more, the initial "examinations" and "consultations" performed by the Barakat Practices did not include any physical examination whatsoever.

85.     In keeping with the fact that the Defendants did not perform any physical examination, the Defendants purported to support their initial examinations and consultations with virtually identical, boilerplate examination forms for every Insured.

86.     By way of example, the Defendants routinely noted in the Insureds' examination reports that the Insured had tenderness to palpation and/or decreased range of motion to "Cervical", "Thoracic" and "Lumbar" and/or shoulders, the ESWT would be provided "3-4" times to the Insured, and the Insured current therapy treatment should continue after receiving the ESWT.

87.     In keeping with the fact that the Defendants did not perform any physical examination, all that was required to complete the Defendants' boilerplate forms was to ask the patient to list their subjective complaints and check off the diagnoses that matched those complaints.

88.     Even more, when the Defendants submitted their respective charges for initial consultations under CPT code 99241, or caused them to be submitted, they falsely represented that an associated healthcare professional: (i) took a "problem focused" patient history; (ii) conducted a "problem focused" examination; (iii) engaged in "straightforward" medical decision making.

89.     For example, the Defendants boilerplate forms do not describe that the Defendants (i) took a "problem focused" patient history; (ii) conducted a "problem focused" examination; or (iii) engaged in "straightforward" medical decision making.

### a.     Misrepresentations Regarding the Performance of Consultations

90.     Pursuant to the Fee Schedule, the use of CPT code 99241 to bill for an initial patient encounter represents that the examining physician performed a "consultation" at the request of another physician or other appropriate source.

91.     However, the Barakat Practices did not provide purported "consultations" – to the extent provided at all – pursuant to a legitimate referral from any other physician or other appropriate source. Rather, to the extent that the putative "consultations" were performed in the first instance, they were performed as a result of the illegal kickback payments and pursuant to the Defendants' fraudulent treatment protocol in order to generate billing for the Barakat Practices.

92.     In keeping with the fact that the Barakat Practices did not provide their purported "consultations" at the request of another physician or appropriate source, the supposed "results" of the putative "consultations" were neither transmitted back to any referring physicians or other appropriate sources, nor were the supposed "results" of the putative "consultations" incorporated into any of the Insureds' treatment plans, or otherwise acted upon in any way.

93.     Pursuant to the Fee Schedule, the use of CPT code 99241 to bill for a patient consultation represents that the physician who performed the consultation submitted a written

consultation report to the physicians or other appropriate sources who purportedly requested the consultations in the first instance.

94.     However – and, again, in keeping with the fact that the Barakat Practices did not provide their purported "consultations" at the request of another physician or appropriate source – the Defendants did not submit any written consultation report to any referring physician or other healthcare provider.

95.     In the claims for purported "consultations" identified in Exhibits "1" through "3", the Barakat Practices misrepresented the underlying services to be consultations billable under CPT code 99241 because such consultations are reimbursable at a higher rate than commensurate patient examinations.

> **b.    Misrepresentations    Regarding    "Problem    Focused"    Physical Examinations**

96.     Pursuant to the Fee Schedule, a physical examination does not qualify as "problem focused" unless the healthcare provider conducts a limited examination of the affected body area or organ system.

97.     When the Defendants billed for the initial consultations under CPT code 99241 through the Barakat Practices, the Defendants falsely represented that they performed "problem focused" examinations on the Insureds they purported to treat during the initial consultations.

98.     As detailed above, the Defendants' initial consultations did not meet the low threshold of "problem focused" because, in reality, the Barakat Practices did not perform any legitimate physical examination of the Insureds.

### c.   Misrepresentations Regarding the Extent of Medical Decision-Making

99.    Similarly, when the Defendants submitted charges for initial consultations under CPT code 99241, they represented that they engaged in "straightforward" medical decision-making.

100.    Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

101.    Though the Defendants routinely falsely represented that their initial consultations involved medical decision-making of a "straightforward" nature when billed under CPT code 99241, in actuality the initial consultations did not involve any medical decision-making at all, and, in the unlikely event that an Insured did present with injuries or symptoms with any degree of complexity, the deficient initial consultations were incapable of assessing and/or diagnosing them as such.

102.    First, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

103.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Barakat Practices, to the extent that the Barakat Practices provided any such diagnostic procedures or treatment options in the first instance.

104.    In almost every instance, any diagnostic procedures and "treatments" that the Defendants actually provided were limited to a series of medically unnecessary, experimental and investigational ESWT, which is not health or life-threatening if properly administered.

105.    Second, the Barakat Practices did not consider any significant number of diagnoses or treatment options for Insureds during the initial consultations.

106.    In fact, no healthcare professional associated with the Barakat Practices engaged in any medical decision-making at all. Rather, the outcome of the initial consultations were pre-determined for virtually every Insured to result in boilerplate "diagnoses" that merely: (i) matched the patients' subjective complaints; and (ii) added diagnoses that would justify performance of the ESWT.

107.    For example, in keeping with the fact that the Barakat Practices performed ESWT on virtually every Insured that received an initial consultation, the result of virtually every initial consultation purportedly performed by the Barakat Practices included diagnoses of cervicalgia (neck pain), thoracic pain, low back pain and/or shoulder pain in order to justify the Barakat Practices' impending performance of ESWT.

108.    In sum, the initial consultations did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the ESWT the Barakat Practices purported to perform and then billed to GEICO and other insurers, and to maximize the Barakat Practices' billing without regard to genuine patient care.

### 2.    The Fraudulent Charges for Follow-Up Examinations

109.    In addition to their fraudulent initial consultations, the Barakat Practices often purported to subject the Insureds in the claims identified in Exhibits "1" through "3" to multiple

fraudulent follow-up examinations during the course of the Defendants' fraudulent treatment and billing protocol.

110.   The Defendants virtually always billed the follow-up examinations to GEICO under CPT code 99212, typically resulting in a charge of $68.82.

111.   Like the Defendants' charges for the initial consultations, the charges for the follow-up examinations were fraudulent in that the follow-up examinations were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the illegal kickback and financial arraignments, referral schemes and fraudulent treatment protocol.

112.   The charges for the follow-up examinations also were fraudulent in that they misrepresented the nature, extent, and results of the follow-up examinations.

113.   For example, like the initial consultations, the result of virtually every follow-up examination purportedly performed by the Barakat Practices included diagnoses of cervicalgia (neck pain), thoracic pain, and/or low back pain in order to justify the Barakat Practices' impending performance of ESWT, and regardless of the purported diagnoses for the Insured, each Insured's treatment plan would be ESWT to "cervical", "thoracic", "lumbar" and/or the shoulders with a frequency of "3-4 times" .

114.   In keeping with the fact that the Barakat Entities' follow-up examinations were not genuine but simply a means to justify their ability to bill for additional services pursuant to a predetermined, fraudulent treatment protocol, the follow-up examinations resulted in virtually every Insured receiving ESWT on the same date of service, immediately following the follow-up examination.

### 3. The Fraudulent Charges for "Extracorporeal Shockwave Therapy"

115. In addition to the fraudulent initial and follow-up examinations, the Defendants purported to systemically subject Insureds to medically unnecessary ESWT "treatments". In keeping with the fact that the Defendants intended to conceal the absence of any physician involvement  the "notes" associated with the ESWT "treatments" never identified who actually performed the service, and the claims that were submitted to GEICO by the Defendants included an NF-3 form that falsely represented that Barakat performed the actual service, including the following representative example:

**15 REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY**

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING | ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES | | |
|---|---|---|---|---|---|---|---|
| 09/21/21 | Facility | 11372 | Follow UP | 99212 | 1 | $68.82 | $68.82 |
| 09/21/21 | Facility | 11372 | Cervical | 0101T | 1 | $699.98 | $699.98 |
| 09/21/21 | Facility | 11372 | Thoracic | 0101T | 1 | $699.98 | $699.98 |
| 09/21/21 | Facility | 11372 | Lumbar | 0101T | 1 | $699.98 | $699.98 |

| PLACE OF SERVICE ADDRESS | 37-03 92nd St., Flushing, NY 11372 | | | TOTAL CHARGES | $2,168.76 |
|---|---|---|---|---|---|

**16 IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING**

| TREATING PROVIDER'S NAME | TITLE | LICENSE OR CERTIFICATION NO | BUSINESS RELATIONSHIP CHECK APPLICABLE BOX | | |
|---|---|---|---|---|---|
| | | | EMPLOYEE | INDEPENDENT CONTRACTOR | OTHER (SPECIFY) |
| Jean Pierre Barakat, MD | | 1205086329 | | | OWNER |

116. The fact that ESWT was not performed by Barakat and that the billing intentionally misrepresented such fact is confirmed by the billing data showing that "services" were allegedly provided at multiple locations (in different counties) on the same day.  For example:

| Date of Service | Number of Clinic Locations |
|---|---|
| July 14, 2021 | 3 (Bronx, Staten Island, Suffolk) |
| August 10, 2021 | 3 (Staten Island, Nassau, Queens) |
| September 14, 2021 | 3 Yonkers, Queens, Nassau |

117.    In addition, the billing data associated with the claims submissions made to GEICO corroborates the fraudulent nature of the billing/treatment protocols. For example, the Barakat Practices routinely submitted bills for over $10,000.00 worth of ESWT over the course of a single patient's treatment, including the following examples:

(i)     Defendants purported to provide ESWT to an Insured named DG at the Clinic located at 1026 Little East Neck Road, West Babylon, New York through Patriot Medical on December 15, 2021, December 22, 2021, December 29, 2021, January 5, 2022, January 12, 2022, January 26, 2022, February 2, 2022, February 9, 2022, February 23, 2022, March 2, 2022, and through JPB Medical at the same Clinic on April 20, 2022. In total, the Defendants billed for approximately $24,149.00 worth of ESWT for this Insured.

(ii)    Defendants purported to provide ESWT to an Insured named JD at the Clinic located at 30 S Ocean Avenue, Freeport, New York through Patriot Medical on January 4, 2022, January 10, 2022, January 18, 2022, February 1, 2022, February 8, 2022, and February 15, 2022, and through JPB Medical at the same Clinic on March 15, 2022 and April 19, 2022. In total, the Defendants billed for approximately $18,903.00 worth of ESWT for this Insured.

(iii)   Defendants purported to provide ESWT to an Insured named SA at the Clinic located at 30 S Ocean Avenue, Freeport, New York through Patriot Medical on January 4, 2022, January 10, 2022, January 18, 2022, and February 22, 2022, and through JPB Medical at the same Clinic on March 15, 2022 and April 19, 2022. In total, the Defendants billed for approximately $10,822.00 worth of ESWT for this Insured.

(iv)    Defendants purported to provide ESWT to an Insured named EM at the Clinic located at 1026 Little East Neck Road, West Babylon, New York through Patriot Medical on January 5, 2022, January 12, 2022, January 19, 2022, February 2, 2022, February 9, 2022, and February 23, 2022, and through JPB Medical at the same Clinic on March 9, 2022, March 16, 2022,

March 23, 2022, April 6, 2022, April 13, 2022, and April 20, 2022. In total, the Defendants billed for approximately $17,154.00 worth of ESWT for this Insured.

(v) Defendants purported to provide ESWT to an Insured named MV at the Clinic located at 1026 Little East Neck Road, West Babylon, New York through Patriot Medical on December 22, 2021, January 26, 2022, February 2, 2022, February 9, 2022, February 16, 2022, and March 2, 2022, and through JPB Medical at the same Clinic on March 16, 2022, March 23, 2022, March 30, 2022, April 13, 2022, and April 20, 2022. In total, the Defendants billed for approximately $11,202.00 worth of ESWT for this Insured.

(vi) Defendants purported to provide ESWT to an Insured named DD at the Clinic located at 1655 Richmond Avenue, Staten Island, New York through the Barakat Sole Proprietorship on July 13, 2021, July 20, 2021, July 27, 2021, and August 31, 2021. In total, the Defendants billed for approximately $11,899.00 worth of ESWT for this Insured.

(vii) Defendants purported to provide ESWT to an Insured named OJ at the Clinic located at 1655 Richmond Avenue, Staten Island, New York through the Barakat Sole Proprietorship on July 6, 2021, July 20, 2021, August 3, 2021, August 10, 2021, and August 19, 2021. In total, the Defendants billed for approximately $13,999.00 worth of ESWT for this Insured.

(viii) Defendants purported to provide ESWT to an Insured named MJ at the Clinic located at 1655 Richmond Avenue, Staten Island, New York through the Barakat Sole Proprietorship on July 6, 2021, July 20, 2021, July 27, 2021, August 3, 2021, and August 19, 2021. In total, the Defendants billed for approximately $14,699.00 worth of ESWT for this Insured.

(ix) Defendants purported to provide ESWT to an Insured named RS at the Clinic located at 1799 Brentwood Road, Brentwood, New York through the Barakat Sole Proprietorship on June 2, 2021, June 9, 2021, June 16, 2021, June 30, 2021, and July 21, 2021. In total, the Defendants billed for approximately $10,505.00 worth of ESWT for this Insured.

(x) Defendants purported to provide ESWT to an Insured named SS at the Clinic located at 37-03 92nd Street, Flushing, New York through the Barakat Sole Proprietorship on August 3, 2021, August 10, 2021, August 17, 2021, August 24, 2021, and September 7, 2021. In total, the Defendants billed for approximately $10,499.00 worth of ESWT for this Insured.

118.    These are only representative examples. Once the ESWT "treatment" was documented by the unidentified technicians, the Defendants then billed GEICO for the performance of ESWT through one of the Barakat Practices using CPT code 0101T.

| | | Code | Description | Relative Value | FUD | PC/TC Split |
|---|---|---|---|---|---|---|
| ■ | | 0042T | Cerebral perfusion analysis using computed tomography with contrast administration, including post-processing of parametric maps with determination of cerebral blood flow, cerebral blood volume, and mean transit time | 15.44 | XXX | |
| ■ | + | 0054T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on fluoroscopic images (List separately in addition to code for primary procedure) | 2.47 | XXX | |
| ■ | + | 0055T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on CT/MRI images (List separately in addition to code for primary procedure) | 3.23 | XXX | |
| | | 0058T | Cryopreservation; reproductive tissue, ovarian | BR | XXX | |
| | | 0071T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume less than 200 cc of tissue | BR | XXX | |
| | | 0072T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume greater or equal to 200 cc of tissue | BR | XXX | |
| ■ | | 0075T | Transcatheter placement of extracranial vertebral artery stent(s), including radiologic supervision and interpretation, open or percutaneous; initial vessel | 18.68 | XXX | |
| ■ | + | 0076T | Transcatheter placement of extracranial vertebral artery stent(s), including radiologic supervision and interpretation, open or percutaneous; each additional vessel (List separately in addition to code for primary procedure) | 17.50 | XXX | |
| | | 0085T | Breath test for heart transplant rejection | BR | XXX | |
| | + | 0095T | Removal of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| | + | 0098T | Revision including replacement of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| ■ | | 0100T | Placement of a subconjunctival retinal prosthesis receiver and pulse generator, and implantation of intra-ocular retinal electrode array, with vitrectomy | 16.22 | XXX | |
| ■ | | 0101T | Extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy | 2.78 | XXX | |

**CATEGORY III CODES**                                                    **0042T–0504T**
**Medical Fee Schedule**                                          **Effective April 1, 2019**

119.    As noted, CPT code 0101T is listed in the Fee Schedule as a "temporary code" identifying emerging and experimental technology. Temporary codes may become permanent codes or deleted during updates of the code set.   Additionally, and as noted in the Fee Schedule, the CPT code (i) is scheduled to be paid using the conversion rate for surgical services, and (ii) does not distinguish between a professional component and technical component, thus confirming that the service need be performed by a licensed physician to be reimbursable.

120.    Furthermore, the ESWT allegedly performed on Insureds was fraudulent because the service that was allegedly provided does not qualify for reimbursement under the CPT code for several independent reasons.   In the first instance, the charges were fraudulent in that the

unlicensed technicians controlled by the John Doe Defendants did not even actually provide ESWT or any service that satisfied the requirements of CPT code 0101T. Rather, the John Doe Defendants arranged to have the unlicensed technicians perform Radial Pressure Wave Therapy on the Insureds. Radial Pressure Wave Therapy involves the low energy delivery of compressed air and is incapable of generating a true shock wave. Radial Pressure Wave Therapy does not satisfy the requirements of CPT code 0101T, which requires "high energy" shockwave.

121.    Second, the charges were fraudulent because the use of ESWT for the treatment of back, neck, and shoulder pain is experimental and investigational in nature. In fact, and in keeping with that characterization: (i) the use of ESWT has not been approved by the US Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain, (ii) there are no legitimate peer reviewed studies that establish the effectiveness of ESWT for the treatment of back, neck, or shoulder pain, and (iii) the Centers for Medicare & Medicaid Services has published coverage guidance for ESWT stating that further research is needed to establish the efficacy and safety of ESWT in the treatment of musculoskeletal conditions; that there is uncertainty associated with this intervention; and it not reasonable and necessary for the treatment of musculoskeletal conditions and therefore not covered.

122.    Notwithstanding the experimental nature, the Defendants purportedly provided ESWT as part of a pre-determined fraudulent protocol to virtually every Insured, without regard to each Insured's individual complaints, symptoms, or presentation. In furtherance of that, the Defendants typically submitted a boilerplate, checklist treatment report without an actual signature, and the ESWT was provided to Insureds soon after their accident without giving the patients the opportunity to sufficiently respond to conservative therapies.

123. For example, there are many examples where the Defendants rendered ESWT to Insureds less than twenty (20) days after the accidents, including the following examples:

(i) Defendants purported to provide ESWT through Patriot Medical to an Insured named ZF on February 8, 2022, only three days after the Insured's accident on February 5, 2022.

(ii) Defendants purported to provide ESWT through the Barakat Sole Proprietorship to an Insured named EP on July 14, 2021, only five days after the Insured's accident on July 9, 2021.

(iii) Defendants purported to provide ESWT through the Barakat Sole Proprietorship to an Insured named SL on June 14, 2021, only five days after the Insured's accident on June 9, 2021.

(iv) Defendants purported to provide ESWT through the Barakat Sole Proprietorship to an Insured named EM on June 3, 2021, only seven days after the Insured's accident on May 26, 2021.

(v) Defendants purported to provide ESWT through the Barakat Sole Proprietorship to an Insured named DV on July 7, 2021, only nine days after the Insured's accident on June 29, 2021.

(vi) Defendants purported to provide ESWT through the Barakat Sole Proprietorship to an Insured named ZT on July 14, 2021, only ten days after the Insured's accident on July 4, 2021.

(vii) Defendants purported to provide ESWT through Patriot Medical to an Insured named DG on December 15, 2021, only 12 days after the Insured's accident on December 3, 2021.

(viii) Defendants purported to provide ESWT through the Barakat Sole Proprietorship to an Insured named FL on July 20, 2021, only 13 days after the Insured's accident on July 7, 2021.

(ix) Defendants purported to provide ESWT through the Barakat Sole Proprietorship to an Insured named CV on June 10, 2021, only 14 days after the Insured's accident on May 27, 2021.

(x) Defendants purported to provide ESWT through the Barakat Sole Proprietorship to an Insured named MT on June 10, 2021, only 14 days after the Insured's accident on May 27, 2021.

(xi) Defendants purported to provide ESWT through the Barakat Sole Proprietorship to an Insured named MP on August 17, 2021, only 14 days after the Insured's accident on August 3, 2021.

(xii) Defendants purported to provide ESWT through the Barakat Sole Proprietorship to an Insured named RS on June 2, 2021, only 15 days after the Insured's accident on May 17, 2021.

(xiii) Defendants purported to provide ESWT through the Barakat Sole Proprietorship to an Insured named PG on July 14, 2021, only 15 days after the Insured's accident on June 29, 2021.

(xiv) Defendants purported to provide ESWT through the Barakat Sole Proprietorship to an Insured named JD on August 10, 2021, only 15 days after the Insured's accident on July 26, 2021.

(xv) Defendants purported to provide ESWT through the Barakat Sole Proprietorship to an Insured named AA on July 14, 2021, only 16 days after the Insured's accident on June 28, 2021.

(xvi) Defendants purported to provide ESWT through the Barakat Sole Proprietorship to an Insured named TM on June 23, 2021, only 17 days after the Insured's accident on June 6, 2021.

(xvii) Defendants purported to provide ESWT through the Barakat Sole Proprietorship to an Insured named OJ on July 6, 2021, only 17 days after the Insured's accident on June 19, 2021.

(xviii) Defendants purported to provide ESWT through Patriot Medical to an Insured named TH on December 15, 2021, only 17 days after the Insured's accident on November 29, 2021.

(xix) Defendants purported to provide ESWT through Patriot Medical to an Insured named WC on January 4, 2022, only 17 days after the Insured's accident on December 17, 2021.

(xx) Defendants purported to provide ESWT through Patriot Medical to an Insured named TJ on February 3, 2022, only 17 days after the Insured's accident on January 17, 2022.

124. These are only representative examples. Additionally, the Defendants routinely provided ESWT to multiple Insureds involved in the same accident from the same Clinics. For example:

(i)     On May 6, 2021, two Insureds – KF and GF – were involved in the same automobile accident. Thereafter, KF and GF both presented to the same Clinic located at 37-03 92nd Street, Flushing, New York, and each purportedly received ESWT through the Barakat Practice.

(ii)    On May 10, 2021, two Insureds – CW and MB – were involved in the same automobile accident. Thereafter, CW and MB both presented to the same Clinic located at 1065 Old Country Road, Westbury, New York, and each purportedly received ESWT through the Barakat Practice.

(iii)   On May 25, 2021, two Insureds – NA and GA – were involved in the same automobile accident. Thereafter, NA and GA both presented to the same Clinic located at 2426 Eastchester Road, Bronx, New York, and each purportedly received ESWT through the Barakat Practice.

(iv)    On June 9, 2021, two Insureds – SL and LC – were involved in the same automobile accident. Thereafter, SL and LC both presented to the same Clinic located at 1065 Old Country Road, Westbury, New York, and each purportedly received ESWT through the Barakat Practice.

(v)     On June 24, 2021, three Insureds – AR, GH, and AA  – were involved in the same automobile accident. Thereafter, AR, GH, and AA all presented to the same Clinic located at 1799 Brentwood Road, Brentwood, New York, and each purportedly received ESWT through the Barakat Practice.

(vi)    On July 31, 2021, two Insureds – MF and GS – were involved in the same automobile accident. Thereafter, MF and GS both presented to the same Clinic located at 37-03 92nd Street, Flushing, New York, and each purportedly received ESWT through the Barakat Practice.

(vii)   On November 9, 2021, two Insureds – CP and PB – were involved in the same automobile accident. Thereafter, CP and PB both presented to the same Clinic located at 30 S Ocean Avenue, Freeport, New York, and each purportedly received ESWT through the Barakat Practice.

(viii)  On October 17, 2021, two Insureds – SA and BC – were involved in the same automobile accident. Thereafter, SA and BC both presented to the same Clinic located at 30 S Ocean Avenue, Freeport, New York, and each purportedly received ESWT through Patriot Medical.

(ix)    On November 20, 2021, two Insureds – JG and FP – were involved in the same automobile accident. Thereafter, JG and FP both presented to the same Clinic located at 2260 Hewlett Avenue, Merrick, New York, and each purportedly received ESWT through the Barakat Practice.

      (x)     On November 28, 2021, two Insureds – SA and BB – were involved in the same automobile accident. Thereafter, SA and BB both presented to the same Clinic located at 30 S Ocean Avenue, Freeport, New York, and each purportedly received ESWT through the Barakat Practice.

125.    These are only representative examples. In all the claims identified in Exhibits "1" – "3", the Defendants falsely represented that Fraudulent Services were medically necessary, when in fact they were not medically necessary for each Insured and were instead provided pursuant to predetermined fraudulent protocols and were therefore not eligible to collect No-Fault Benefits in the first instance.

126.    In addition to the billing for ESWT being fraudulent for the reasons described above, the charges were also fraudulent because the bills misrepresented the amounts collectible for each date of service.  More specifically, CPT Code 0101T only contemplates the billing for the code once per date of service.  The code specifically describes the service as pertaining to the "musculoskeletal system", not a patient's individual limb or spine/trunk sections.

127.    Notwithstanding the clear language of the code, the bills fraudulently unbundled the service in the billing that was prepared and submitted by duplicating the code multiple times (and increasing the corresponding charges) for each section of the Insured's body to which the ESWT was performed.  The following are representative examples:

## Barakat Practice

| 15 REPORT OF SERVICES RENDERED — ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | | | | |
|---|---|---|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING | ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | | CHARGES | |
| 08/10/21 | Facility | 11520 | Follow UP | 99212 | 1 | $68.82 | $68.82 |
| 08/10/21 | Facility | 11520 | Cervical | 0101T | 1 | $699.98 | $699.98 |
| 08/10/21 | Facility | 11520 | Lumbar | 0101T | 1 | $699.98 | $699.98 |
| 08/10/21 | Facility | 11520 | Thoracic | 0101T | 1 | $699.98 | $699.98 |
| PLACE OF SERVICE ADDRESS | 30 South Ocean Ave. Suite 102, Freeport, NY 11520 | | | TOTAL CHARGES | | $2,168.76 | |

## Patriot Medical

| 15 REPORT OF SERVICES RENDERED — ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | | | | |
|---|---|---|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING | ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | | CHARGES | |
| 09/21/21 | Facility | 11372 | Follow UP | 99212 | 1 | $68.82 | $68.82 |
| 09/21/21 | Facility | 11372 | Cervical | 0101T | 1 | $699.98 | $699.98 |
| 09/21/21 | Facility | 11372 | Thoracic | 0101T | 1 | $699.98 | $699.98 |
| 09/21/21 | Facility | 11372 | Lumbar | 0101T | 1 | $699.98 | $699.98 |
| PLACE OF SERVICE ADDRESS | 37-03 92nd St., Flushing, NY 11372 | | | TOTAL CHARGES | | $2,168.76 | |

16. IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING

**JPB Medical**

| 15 REPORT OF SERVICES RENDERED – ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | | | | |
|---|---|---|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING | ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | | CHARGES | |
| 03/15/22 | Facility | 11520 | Follow UP | 99212 | 1 | $68.82 | $68.82 |
| 03/15/22 | Facility | 11520 | Cervical | 0101T | 1 | $700.39 | $700.39 |
| 03/15/22 | Facility | 11520 | Thoracic | 0101T | 1 | $700.39 | $700.39 |
| 03/15/22 | Facility | 11520 | Lumbar | 0101T | 1 | $700.39 | $700.39 |
| PLACE OF SERVICE ADDRESS | 30 South Ocean Ave, Freeport, NY 11520 | | | TOTAL CHARGES | | $2,169.99 | - |

128.    In all of the claims identified in Exhibits "1" – "3" for ESWT testing, the Defendants falsely represented that the ESWT charges were medically necessary, were performed and/or supervised by Barakat, and were appropriately charged, when in fact they were not medically necessary for each Insured, were conducted by unlicensed technicians pursuant to predetermined fraudulent protocols, were inappropriately unbundled, and were therefore not eligible to collect No-Fault Benefits in the first instance.

129.    In doing so, the Defendants artificially and fraudulently increased the amount of reimbursement to which they would be entitled by three (3) to four (4) times for each date of service.

**E.    The Fraudulent Billing for Independent Contractor Services**

130.    Defendants fraudulent scheme also included the submission of claims to GEICO using the Barakat Practices seeking payment for services provided by individuals that the Barakat Practices never employed.

131.    Under the New York no-fault insurance laws, billing entities (including sole proprietorships) are ineligible to bill for or receive payment for goods or services provided by independent contractors.  The healthcare services must be provided by the billing provider itself, or by its employees.

132.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that billing entities are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services");  DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals).

133.    The Barakat Practices sent hundreds of bills to GEICO using the United States mails seeking payment for the Fraudulent Services purportedly performed by individuals other than Barakat, while falsely representing in every bill that Barakat was the provider of the service in question. This was done intentionally and to avoid the possibility that insurance companies such as GEICO would deny the bill for eligibility if an accurate representation had been made regarding

who actually performed the services and their relationship to the billing provider, which was being unlawfully operated and controlled by the John Doe Defendants.

134.    In fact, virtually every NF-3 form that was submitted to GEICO appeared as one of the following:

| 16 IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING | | | | | |
| TREATING PROVIDER'S NAME | TITLE | LICENSE OR CERTIFICATION NO. | BUSINESS RELATIONSHIP CHECK APPLICABLE BOX | | |
| | | | EMPLOYEE | INDEPENDENT CONTRACTOR | OTHER (SPECIFY) |
| Jean Pierre Barakat, MD | | 1205086329 | | | OWNER |

| 16 IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING | | | | | |
| TREATING PROVIDER'S NAME | TITLE | LICENSE OR CERTIFICATION NO | BUSINESS RELATIONSHIP CHECK APPLICABLE BOX | | |
| | | | EMPLOYEE | INDEPENDENT CONTRACTOR | OTHER (SPECIFY) |
| Dr Jean Pierre Barakat, MD | | 250159 | | | OWNER |

135.    In fact, the statements in each of the NF-3 forms were false and fraudulent in that the unlicensed technicians – who performed virtually all of the Fraudulent Services, including all of the ESWT – were never (i) employed by Barakat or the Barakat Practices, (ii) under Barakat's direction and/or control, (iii) set their own work schedules or had their schedules set for them by the John Doe Defendants, and (iv) did not exclusively provide services for the Barakat Practices.

136.    To the extent that they were performed in the first instance, all of the ESWT were performed by technicians whom the Defendants treated as independent contractors.

137.    For instance, the Defendants:

(i)     paid the health care professionals and/or technicians, either in whole or in part, on a 1099 basis rather than a W-2 basis;

(ii)    established an understanding with the health care professionals and/or technicians that they were independent contractors, rather than employees;

(iii)   paid no employee benefits to the health care professionals and/or technicians;

(iv)    failed to secure and maintain W-4 or I-9 forms for the health care professionals and/or technicians;

(v)    failed to withhold federal, state, or city taxes on behalf of the health care professionals and/or technicians;

(vi)    compelled the health care professionals to pay for their own malpractice insurance at their own expense;

(vii)    permitted the health care professionals and/or technicians to set their own schedules and days on which they desired to perform services;

(viii)    permitted the health care professionals and/or technicians to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other practices;

(ix)    failed to cover the health care professionals and/or technicians for either unemployment or workers' compensation benefits; and

(x)    filed corporate and payroll tax returns (e.g., Internal Revenue Service ("IRS") forms 1120 and 941 and New York State NYS-45 WEB Forms) that did not report: (i) all of the monies they paid for the services of the healthcare professionals and/or technicians; and/or (ii) the identity of each healthcare professional and/or technician who performed the Fraudulent Services, to the extent Defendants included a list of "employees" with their filings.

138.    By electing to treat the healthcare professionals as independent contractors, the Defendants realized significant economic benefits – for instance:

(i)    avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)    avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)    avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)    avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)    avoiding the need to secure any malpractice insurance; and

(vi)    avoiding claims of agency-based liability arising from work performed by the health care professionals.

139.    Because virtually all of the Fraudulent Services, including all of the ESWT services, to the extent provided at all, were performed by individuals not employed by Barakat and/or the Barakat Practices, the Defendants never had any right to bill or to collect No-fault Benefits for that reason or to realize any economic benefit from the claims seeking payment for these Fraudulent Services. The misrepresentations and acts of fraudulent concealment outlined in this Complaint were consciously designed to mislead GEICO into believing that it was obligated to pay the claim submissions.

## III.    The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO

140.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted to GEICO hundreds of NF-3 forms, AOBs and medical reports/records using the name of the Barakat Practices and their respective tax identification numbers seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

141.    The NF-3 forms, reports, AOBs and other documents submitted to GEICO by and on behalf of Defendants were false and misleading in the following material respects:

(i)    The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants uniformly misrepresented that Barakat had performed the Fraudulent Services and that her name, license and the tax identification number of the Barakat Practices was being legitimately used to bill for the Fraudulent Services, making them eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) despite the fact that the John Doe Defendants unlawfully and secretly controlled, operated and managed the medical "practice".

(ii)    The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants, uniformly misrepresented and

exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided.

(iii)    The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants, uniformly concealed the fact that the Fraudulent Services were provided – to the extent provided at all – pursuant to illegal kickback and referral arrangements.

(iv)    The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants uniformly misrepresented that the Fraudulent Services were medically necessary when the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.

(v)    The NF-3 forms, letters and other supporting documentation submitted by, and on behalf of, the Defendants, uniformly misrepresented to GEICO that the claims were eligible for payment pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 even though virtually all of the services were provided by unlicensed individuals not employed by Barakat or the Barakat Practices.

## IV.    Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

142.    Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

143.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systematically made material misrepresentations, concealed their fraud and the underlying fraudulent scheme and went to great lengths to accomplish this concealment.

144.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the participation of Barakat in the performance of the Fraudulent Services and Barakat's ownership, control and/or management of the Barakat Practices. Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

145.     Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed, to the extent they were performed at all, pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.  In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the unlicensed individuals to prevent GEICO from discovering that virtually all of the Fraudulent Services, including all of the ESWT services, were not eligible for reimbursement because they were not provided by individuals that were employed by Barakat and/or the Barakat Practices.

146.     GEICO takes steps to timely respond to all claims and to ensure that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and mailed in a timely manner. GEICO is also under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $644,000.00 based upon the fraudulent charges.

147.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## AS AND FOR A FIRST CAUSE OF ACTION
### Against the Barakat Sole Proprietorship, Patriot Medical, and JPB Medical
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

148.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 147 of this Complaint as if fully set forth at length herein.

149.    There is an actual case and controversy between GEICO on the one hand and the Barakat Sole Proprietorship, Patriot Medical, and JPB Medical on the other hand regarding more than $820,000.00 in unpaid billing for the Fraudulent Services that were submitted to GEICO.

150.    The Barakat Sole Proprietorship, Patriot Medical, and JPB Medical have no right to receive payment from GEICO on the unpaid billing because the billed-for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers.

151.    The Barakat Sole Proprietorship, Patriot Medical, and JPB Medical have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to illegal kickbacks and referral relationships between the Defendants and the Clinics.

152.    The Barakat Sole Proprietorship, Patriot Medical, and JPB Medical have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to predetermined fraudulent protocols that serve to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

153.    The Barakat Sole Proprietorship, Patriot Medical, and JPB Medical have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.

154.    The Barakat Sole Proprietorship, Patriot Medical, and JPB Medical have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services fraudulently misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

155.    The Barakat Sole Proprietorship, Patriot Medical, and JPB Medical have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services fraudulently misrepresented that they were performed by Barakat and virtually all of the Fraudulent Services were instead performed -- to the extent provided at all -- by unlicensed individuals who were neither supervised by nor employed by Barakat, the Barakat Sole Proprietorship, Patriot Medical, or JPB Medical.

156.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Barakat Sole Proprietorship, Patriot Medical, and JPB Medical have no right to receive payment for any pending bills submitted to GEICO.

## AS AND FOR A SECOND CAUSE OF ACTION
### Against Barakat and the John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

157.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 156 of this Complaint as if fully set forth at length herein.

158.    The Barakat Sole Proprietorship is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce. Barakat and the

John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Barakat Sole Proprietorship's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that the Barakat Sole Proprietorship was not eligible to receive under the No-Fault Laws, because: (i) the billed-for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which were being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed-for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed-for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed-for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) virtually all of the billed-for services including all of the ESWT services - to the extent provided at all - were not provided by Barakat or any other licensed physician, but by persons who were unlicensed, and not directly supervised by Barakat or employed by the Barakat Sole Proprietorship. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibit "1".

159.    The Barakat Sole Proprietorship's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Barakat and the John Doe Defendants operate the Barakat Sole Proprietorship, inasmuch as the Barakat Sole Proprietorship's never operated as a legitimate medical practice, never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for the Barakat Sole Proprietorship to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Barakat Sole Proprietorship to the present day.

160.    The Barakat Sole Proprietorship is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by the Barakat Sole Proprietorship in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $183,000.00 pursuant to the fraudulent bills submitted by Barakat and the John Doe Defendants through the Barakat Sole Proprietorship.

161.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A THIRD CAUSE OF ACTION
**Against Barakat and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

162.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 161 of this Complaint as if fully set forth at length herein.

163.    The Barakat Sole Proprietorship is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

164.    Barakat and the John Doe Defendants are employed by and/or associated with the Barakat Sole Proprietorship.

165.    Barakat and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Barakat Sole Proprietorship's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the Barakat Sole Proprietorship was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which were being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed-for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed-for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed-for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) virtually all of the billed-for services including all of the ESWT services - to the extent provided at all - were not provided by Barakat or any other licensed physician, but by persons who were unlicensed, and not

directly supervised by Barakat or employed by the Barakat Sole Proprietorship.  The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibit "1".

166.    Barakat and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

167.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $183,000.00 pursuant to the fraudulent bills submitted by Defendants through the Barakat Sole Proprietorship.

168.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**Against the Barakat Sole Proprietorship, Barakat, and the John Doe Defendants**
**(Common Law Fraud)**

169.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 168 of this Complaint as if fully set forth at length herein.

170.    Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

171.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Barakat had performed the Fraudulent Services and that his name, license and the tax identification number of the Barakat Sole Proprietorship was being legitimately used to bill for the Fraudulent Services, making them eligible for payment

pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact Barakat never performed any of the services and the  John Doe Defendants unlawfully and secretly controlled, operated and managed the Barakat Sole Proprietorship; (ii) the representation that the billed-for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) the representation that the billed-for services were eligible for reimbursement, when in fact the services were provided -- to the extent provided at all – pursuant to illegal kickback and referral arrangements between the Defendants and the Clinics; (iv) the representation that the billed-for services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) the representation that the billed-for services were eligible for payment because the services were provided by Barakat, when in fact virtually all of the services, including all of the ESWT services, were provided – to the extend provided at all – by unlicensed individuals that were never supervised by Barakat nor employed by the Barakat Sole Proprietorship.

172.   Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the Barakat Sole Proprietorship that were not compensable under New York no-fault insurance laws.

173.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $183,000.00 pursuant to the fraudulent bills submitted by the Defendants.

174.     Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

175.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**Against the Barakat Sole Proprietorship, Barakat, and the John Doe Defendants**
**(Unjust Enrichment)**

176.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 175 of this Complaint as if fully set forth at length herein.

177.     As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

178.     When GEICO paid the bills and charges submitted by or on behalf of the Barakat Sole Proprietorship for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

179.     Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

180.     Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

181.     By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $183,000.00.

## AS AND FOR A SIXTH CAUSE OF ACTION
### Against Barakat and the John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

182.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 181 of this Complaint as if fully set forth at length herein.

183.    Patriot Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce. Barakat and the John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of Patriot Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Patriot Medical was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which were being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed-for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed-for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed-for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) virtually all of the billed-for services, including all of the ESWT services - to the extent provided at all - were not provided by

Barakat or any other licensed physician, but by persons who were unlicensed, and not directly supervised by Barakat or employed by Patriot Medical. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibit "2".

184.    Patriot Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Barakat and the John Doe Defendants operate Patriot Medical, inasmuch as Patriot Medical never operated as a legitimate medical practice, never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for Patriot Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Patriot Medical to the present day.

185.    Patriot Medical is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by Patriot Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $449,000.00 pursuant to the fraudulent bills submitted by Barakat and the John Doe Defendants through Patriot Medical.

186.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Against Barakat and the John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

187.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 186 of this Complaint as if fully set forth at length herein.

188.    Patriot Medical is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

189.    Barakat and the John Doe Defendants are employed by and/or associated with Patriot Medical.

190.    Barakat and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Patriot Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that Patriot Medical was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were submitted through medical practices not legitimately owned or controlled by a licensed physician, but which were being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed-for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed-for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed-for services uniformly

misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) virtually all of the billed-for services, including all of the ESWT services - to the extent provided at all - were not provided by Barakat or any other licensed physician, but by persons who were unlicensed, and not directly supervised by Barakat or employed by Patriot Medical.  The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibit "2".

191.    Barakat and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

192.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $449,000.00 pursuant to the fraudulent bills submitted by Defendants through Patriot Medical.

193.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### Against Patriot Medical, Barakat, and the John Doe Defendants
#### (Common Law Fraud)

194.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 193 of this Complaint as if fully set forth at length herein.

195.    Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

196.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Barakat had performed the Fraudulent Services and that him name, license and the tax identification number of Patriot Medical was being legitimately used to bill for the Fraudulent Services, making them eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact Barakat never performed any of the services and the John Doe Defendants unlawfully and secretly controlled, operated and managed Patriot Medical; (ii) the representation that the billed-for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) the representation that the billed-for services were eligible for reimbursement, when in fact the services were provided -- to the extent provided at all – pursuant to illegal kickback and referral arrangements between the Defendants and the Clinics; (iv) the representation that the billed-for services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) the representation that the billed-for services were eligible for payment because the services were provided by Barakat, when in fact virtually all of the services, including all of the ESWT services, were provided by unlicensed individuals that were never supervised by Barakat or employed by Patriot Medical.

197.    Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Patriot Medical that were not compensable under New York no-fault insurance laws.

198.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and, as a proximate result, has been injured in its business and property by

reason of the above-described conduct in that it has paid at least $449,000.00 pursuant to the fraudulent bills submitted by the Defendants.

199.    Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

200.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A NINTH CAUSE OF ACTION
**Against Patriot Medical, Barakat, and the John Doe Defendants**
**(Unjust Enrichment)**

201.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 200 of this Complaint as if fully set forth at length herein.

202.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

203.    When GEICO paid the bills and charges submitted by or on behalf of Patriot Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

204.    Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

205.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

206.    By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $449,000.00.

## AS AND FOR AN TENTH CAUSE OF ACTION
### Against Barakat and the John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

207.    GEICO incorporates, as though fully set forth herein, each and every allegation in

paragraphs 1 through 206 of this Complaint as if fully set forth at length herein.

208.    JPB Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. §

1961(4), that engages in activities which affect interstate commerce. Barakat and the John Doe

Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of

JPB Medical's affairs through a pattern of racketeering activity consisting of repeated violations of

the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to

submit or cause to be submitted hundreds of fraudulent charges seeking payments that JPB Medical

was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were

submitted through a medical practice not legitimately owned or controlled by a licensed physician,

but which were being operated, managed, and controlled by the John Doe Defendants for purposes

of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile

insurers; (ii) the billed-for services were provided, to the extent provided at all, pursuant to the

dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare

providers, and as a result of illegal financial arrangements between the Defendants and the Clinics;

(iii) the billed-for services were provided, to the extent provided at all, pursuant to pre-determined

fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather

than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the

billed-for services uniformly misrepresented and exaggerated the level, nature, necessity, and results

of the Fraudulent Services that purportedly were provided; and (v) virtually all of the billed-for

services including all of the ESWT services - to the extent provided at all - were not provided by

Barakat or any other licensed physician, but by persons who were unlicensed, and not directly supervised by Barakat or employed by JPB Medical. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibit "3".

209.    JPB Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Barakat and the John Doe Defendants operate JPB Medical, inasmuch as JPB Medical never operated as a legitimate medical practice, never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for JPB Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through JPB Medical to the present day.

210.    JPB Medical is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by JPB Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $12,000.00 pursuant to the fraudulent bills submitted by the Barakat and the John Doe Defendants through JPB Medical.

211.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### Against Barakat and the John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

212.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 211 of this Complaint as if fully set forth at length herein.

213.     JPB Medical is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

214.     Barakat and the John Doe Defendants are employed by and/or associated with JPB Medical.

215.     Barakat and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of JPB Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that JPB Medical was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were submitted through medical practices not legitimately owned or controlled by a licensed physician, but which were being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed-for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed-for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed-for services uniformly

misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) virtually all of the billed-for services including all of the ESWT services - to the extent provided at all - were not provided by Barakat or any other licensed physician, but by persons who were unlicensed, and not directly supervised by Barakat or employed by JPB Medical.  The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibit "3".

216.    Barakat and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

217.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $12,000.00 pursuant to the fraudulent bills submitted by Defendants through JPB Medical.

218.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A TWELFTH CAUSE OF ACTION**
**Against JPB Medical, Barakat, and the John Doe Defendants**
**(Common Law Fraud)**

219.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 218 of this Complaint as if fully set forth at length herein.

220.    Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

221.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Barakat had performed the Fraudulent Services and that him name, license and the tax identification number of JPB Medical was being legitimately used to bill for the Fraudulent Services, making them eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12), when in fact Barakat never performed any of the services and the John Doe Defendants unlawfully and secretly controlled, operated and managed JPB Medical; (ii) the representation that the billed-for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) the representation that the billed-for services were eligible for reimbursement, when in fact the services were provided – to the extent provided at all – pursuant to illegal kickback and referral arrangements between the Defendants and the Clinics; (iv) the representation that the billed-for services were medically necessary when they were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) the representation the billed-for services were eligible for payment because the services were provided by Barakat, when in fact virtually all of the services, including all of the ESWT services, were provided by unlicensed individuals that were never supervised by Barakat or employed by JPB Medical.

222.    Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through JPB Medical that were not compensable under New York no-fault insurance laws.

223.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by

reason of the above-described conduct in that it has paid at least $12,000.00 pursuant to the fraudulent bills submitted by the Defendants.

224. Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

225. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A THIRTEENTH CAUSE OF ACTION
**Against JPB Medical, Barakat, and the John Doe Defendants**
**(Unjust Enrichment)**

226. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 225 of this Complaint as if fully set forth at length herein.

227. As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

228. When GEICO paid the bills and charges submitted by or on behalf of JPB Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

229. Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

230. Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

231. By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $12,000.00.

**AS AND FOR A FOURTEENTH CAUSE OF ACTION**
**Against Barakat and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

232.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 231 of this Complaint as if fully set forth at length herein.

233.    The Barakat Sole Proprietorship, Patriot Medical and JPB Medical together constitute an association-in-fact "enterprise" (the "Barakat Fraud Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

234.    The members of the Barakat Fraud Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, the Barakat Sole Proprietorship, Patriot Medical and JPB Medical are ostensibly independent businesses – with different names and tax identification numbers – that were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO.

235.    The Barakat Fraud Enterprise operated under three separate names and tax identification numbers in order to limit the time period and volume of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one business. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Barakat Fraud Enterprise acting singly or without the aid of each other.

236.    The Barakat Fraud Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing and coordinating many individuals who have been responsible for facilitating and performing a wide

variety of administrative and ostensibly professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

237.    Barakat and the John Doe Defendants have each been employed by and/or associated with the Barakat Fraud Enterprise.

238.    Barakat and the John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Barakat Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that the Barakat Fraud Enterprise was not eligible to receive under the No-Fault Laws, because: (i) the billed-for services were submitted through medical practices not legitimately owned or controlled by a licensed physician, but which were being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed-for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed-for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise

benefit the Insureds; (iv) the claim submissions seeking payment for the billed-for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) virtually all of the billed-for services including all of the ESWT services - to the extent provided at all - were not provided by Barakat or any other licensed physician, but by persons who were unlicensed, and not directly supervised by Barakat or employed by the Barakat Practices. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibits "1" – "3".

239.    The Barakat Fraud Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of allowing unlicensed persons to illegally own and control healthcare practices and submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Barakat and the John Doe Defendants operate the Barakat Fraud Enterprise, inasmuch as the Barakat Fraud Enterprise never operated as a legitimate medical practice, never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for the enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Barakat Sole Proprietorship, Patriot Medical and JPB Medical to the present day.

240.    The Barakat Fraud Enterprise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by the Barakat Fraud Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing. GEICO has been injured in its business and property by reason

of the above-described conduct in that it has paid at least $644,000.00 pursuant to the fraudulent bills submitted by Barakat and the John Doe Defendants through the Barakat Fraud Enterprise.

241.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A FIFTEENTH CAUSE OF ACTION
### Against Barakat and the John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

242.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 241 of this Complaint as if fully set forth at length herein.

243.    The Barakat Fraud Enterprise is an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

244.    Barakat and the John Doe Defendants are employed by and/or associated with the Barakat Fraud Enterprise.

245.    Barakat and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Barakat Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the Barakat Sole Proprietorship, Patriot Medical and JPB Medical were not eligible to receive under the No-Fault Laws because: (i) the billed-for services were submitted through medical practices not legitimately owned or controlled by a licensed physician, but which were being operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed-for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based

upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed-for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed-for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) virtually all of the billed-for services including all of the ESWT services - to the extent provided at all - were not provided by Barakat or any other licensed physician, but by persons who were unlicensed, and not directly supervised by Barakat or employed by the Barakat Practices.  The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibits "1" – "3".

246.   Barakat and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

247.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $644,000.00 pursuant to the fraudulent bills submitted by Defendants through the Barakat Sole Proprietorship, Patriot Medical and JPB Medical.

248.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## **JURY DEMAND**

249.   Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company, demand that a Judgment be entered in their favor and against the Defendants, as follows:

A.      On the First Cause of Action against the Barakat Sole Proprietorship, Patriot Medical, and JPB Medical, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Barakat Sole Proprietorship, Patriot Medical, and JPB Medical have no right to receive payment for any pending bills for the Fraudulent Services submitted to GEICO;

B.      On the Second Cause of Action against Barakat and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $183,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Barakat and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $183,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against the Barakat Sole Proprietorship, Barakat, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $183,000.00, together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

E.      On the Fifth Cause of Action against the Barakat Sole Proprietorship, Barakat, and John Doe Defendants, more than $183,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Barakat and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $449,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

G.      On the Seventh Cause of Action against Barakat and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $449,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against Patriot Medical, Barakat, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $449,000.00 together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

I.      On the Ninth Cause of Action against Patriot Medical, Barakat, and the John Doe Defendants, more than $449,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Barakat and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $12,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

K.      On the Eleventh Cause of Action against Barakat and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $12,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

L.      On the Twelfth Cause of Action against JPB Medical, Barakat, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $12,000.00 together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

M.      On the Thirteenth Cause of Action against JPB Medical, Barakat, and the John Doe Defendants, more than $12,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

N.      On the Fourteenth Cause of Action against Barakat and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $644,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest; and

O.      On the Fifteenth Cause of Action against Barakat and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $644,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest.

Dated: December 12, 2022

                                    RIVKIN RADLER LLP

                                    By: _____/s/ Barry I. Levy_____
                                        Barry I. Levy, Esq.
                                        Michael Vanunu, Esq.
                                        Garin Scollan, Esq.
                                    926 RXR Plaza
                                    Uniondale, New York 11556
                                     (516) 357-3000

                                    *Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*